W. T. RATLIFF, TAX COLLECTOR, v. AMBUS BEALE.

POLL TAX. *Distress. Nontaxable property. Section 243, constitution 1890.*
   Property which is exempt from taxation cannot be distrained to
   coerce the payment of a poll tax due from the owner, sec. 243 of
   the constitution of 1890 providing that the poll tax shall be a lien
   only on taxable property.

FROM the chancery court, first district, of Hinds county.
HON. HENRY C. CONN, Chancellor.
The facts are fully stated in the opinion of the court.

*Wiley N. Nash, Attorney-general,* for appellant.

Upon the decision of this case depends (1) the amount of poll
tax to be hereafter collected in this state for all time to come;
(2) the construction of the lien clause in sec. 243 of the state
constitution; (3) whether our free public school system is to
suffer by a strained construction of the instrument by which it
is created. The importance of these matters to the state is so
great that I do not hesitate to appear in the case, and that, too,
though entertaining some doubt as to whether or not it is my
official duty to do so.

The bill claims that, under a clause in sec. 243 of the state
constitution, no property which is exempt from taxation can
be seized or charged in any manner for the payment of the
poll tax, the particular clause being "said tax (*i. e.*, poll tax)
to be a lien only on taxable property."

Over one hundred years ago, in England, it was said by a
full court, "that the sheriff, by the levying of goods by *fiere
facias,* as he seizes the goods, gets a property in the goods against
all persons," etc. *Clerk* v. *Withers,* 6 Modern Reports, 298.

So it is evident that in the seizure of the goods, in the case
at bar, the sheriff did not get a lien, but more than a lien. He
got a property in the goods, to be divested only upon payment

of the poll tax and all legal costs and charges.   Whenever the sheriff or other officer makes a valid levy, seizure or distraint of goods, he has a vested right, a legal property, in such goods.   This property is acquired under the law and by the valid levy, seizure or distraint, and the property becomes re-vested in the general or original owner only when the demand, the execution or other process, is satisfied.   In cases of levy, seizure or distraint of property, the sheriff or other officer asserts title to the property under the process or mode of pro-ceeding.   By taking the property under the levy, seizure or dis-tress, the officer acquires a certain special legal property in and to the goods so levied, seized or distrained, which property or title holds good until the satisfaction of the particular debt, charge, demand or claim.

If the framers of the present constitution intended, that, for the payment of the poll tax, nontaxable property should be liable to no process whatever, why, in the name of common sense, did they not say so ?   What language does the code use in reference to personal property exempt ?   This is the lan-guage used: ''The following property shall be exempt from seizure under execution or attachment, to wit,'' etc.   Code 1892, § 1963.   What uncertainty is there here ?   Is there any mistaking of this language ?   What is the language used by the legislature in regard to homestead exemptions ?   It is this: ''Every citizen of this state, male or female, being a householder and having a family, shall be entitled to hold, ex-empt from seizure or sale under execution or attachment,'' etc.   Code 1892, § 1970.   There is nothing uncertain about this—there is no mistaking such language.   In these two sections, 1970 and 1963, the legislature said there was some virtue in the words ''seizure and sale.''   In the one case the law says certain property shall not, and in the other that it shall, be sold.

It does seem that if it had been intended in § 243 of the con-stitution to exempt all nontaxable property from distraint,

seizure or sale for the nonpayment of the poll tax, the framers thereof would have used the same or similar language to that used to exempt personal property and the homestead from seizure or sale under execution or attachment. It could have been done in the same number of words.

The public policy proposition of appellee's counsel can be answered conclusively by saying to those who contend that every effort should be made to uphold in every possible way the franchise scheme as announced in the new constitution, that every effort should be made to uphold in every possible way the free public school system as announced in the new constitution. Admitting that both are equally important, then certainly the court will not, by a construction, and a strained construction, pull down one to build up the other. Placing both on flat-footed equality, then the meaning of the word lien, used in § 243 of the new constitution, will not be enlarged, but will be considered in its ordinary, primary, and obvious sense.

Where the constitution is not entirely explicit within itself, it ought not to be so construed as to cripple the government and render it unequal to the objects for which it was instituted. Chief Justice Sharkey, in *Smith* v. *Halfacre*, 6 Howard, 600, citing 9 Wheat., 1; *Leachman* v. *Musgrove*, 45 M., 511.

We cannot say too much in behalf of our schools. Mississippi—the people of Mississippi—cannot do too much in their behalf. Through them, up to this good hour, much has been accomplished—much that ennobles and elevates the human race. By these in this country, in a large measure, are to be drilled and mustered those forces with which is to be fought, in the years to come, every moral, social, political and religious conflict.

In conclusion, and without recapitulation, it is believed that this court, in view of the facts, the law and the constitution, and after considering the case fully and in all its phases, will reverse the decree and judgment of the court below, sustain the motion to dissolve the injunction and dismiss the bill.

*J. A. P. Campbell*, on same side.

The real question is as to the meaning of the clause in sec. 243 of the constitution, in these words: "Said tax to be a lien only upon taxable property." In what sense was the word "lien" used? Was it in the sense of liability or right to resort to it as means of payment? This is repelled by the fact that the poll tax was imposed by the constitution "in aid of the common schools," and, in order to be an aid, it must be collected; and it is not to be charged that the convention falsely pretended to be aiding common schools, when at the same time it was scheming to prevent this aid, by providing against the collection of the poll tax; that it professed a purpose to aid the common schools, but this was a mere pretense, and the poll tax was not to be enforced as to the very large majority of those subject to it. The prohibition of criminal proceedings to collect poll tax strongly suggests the admissibility of civil proceedings, and can it be that it was intended that the vast majority liable should escape payment? Is the constitution as to this a sham and fraud, professing one thing and intending another? Is the grant to boards of supervisors of power to increase the poll tax by one dollar, to aid the common schools of their counties, of like delusive character? That tax is not subject to the provision as to lien.

Can it be that it is a part of the constitutional plan to exclude negroes from the ballot box, to make the poll tax uncollectible, and yet put it in the power of the legislature to thwart the plan by making all property taxable, when no question as to a lien would arise? The convention refused to commit to the legislature any power over the matter of establishing and maintaining common schools. · It provided for them and their support, and levied a poll tax, as part of the means of their support, and, if it was not guilty of deception and double dealing, the poll tax was meant to be collected. The tax is upon the person—it could not be a lien on him—and were it a lien on nontaxable property, it would fetter exchanges and produce

embarrassment as to the transfer of articles not taxable, which, if subject to a charge, would, for purposes of transfer, be reduced in value.

The constitution was made in the midst of existing institutions and in view of a body of statute law relating to many things, and, among them, to taxation. For a long time it had been provided by statute, in force when the constitution was made, that "taxes assessed shall be a lien upon and bind the property assessed from the first day of February," etc., and it must have been in view of this and to limit this lien or charge to tax the property that the clause was adopted. The term lien was used, not in any general or loose and unusual sense, as argued, but in its usual sense, and in the sense well understood from long usage and existing statutes on the subject of taxes and their collection. Our statutes not only made taxes on property a lien, but declared that no property should be exempt from distress and sale for taxes. If it was the purpose of the convention to free nontaxable property from liability for poll taxes in civil proceedings, why was it not so said? Why employ an equivocal expression? Why leave the matter in doubt? Is it not manifest that it is an afterthought to seek to use the clause under consideration as a deep-laid scheme to fool the public and exclude negroes from voting? It will not do to interpret the constitution by its practical operation as to this.

One thing is certain, if schools are to be aided, the poll tax is to be collected; and if nontaxable property is not liable, the tax is a sham and delusion, for probably nine-tenths of those liable to poll tax will escape payment. They who pay taxes on property will be the only persons paying poll tax, and the vast majority of heads of families will escape payment of poll tax, almost the only tax by which they can be made to contribute to the enormous burden of educating their children. A lien is a tie that binds property, such hold upon it that it cannot be disposed of except subject to the claim. Anderson's

Law Dictionary; *Anderson* v. *State*, 23 Miss., 459; *Morgan* v. *Campbell*, 22 Wallace, 390. The average member of the constitutional convention must have understood the term lien as used in our jurisprudence. Can it be that the poll tax was imposed to exclude negroes from voting? The constitution says it was to aid common schools. Is that a lie? We copied from Massachusett's constitution. Was that to exclude negroes? Who shall say it was more desired to exclude from voting than to maintain schools?

It must be assumed by the court, I think, that the poll tax was imposed in good faith for the purpose stated by the constitution, and was intended to be collected, and that exclusion from voting, as a consequence of nonpayment of all taxes (poll tax included), was intended quite as much to secure payment as to exclude from the ballot box. Like a tariff for revenue with incidental protection, and not for protection as its chief aim, exclusion from voting may have been looked to as likely to occur in many instances from default in payment of taxes, but that would be puerile as a remedy for the evils of an unsatisfactory body of electors. Let the negro feel an interest in elections, and he will as surely pay his taxes as he will raise money to go to a circus, and, if he did not, campaign funds would pay for him if his vote was looked to.

If it was the purpose of the convention to prohibit resort by civil proceedings to property not taxable for collection of poll tax, why did it not say so in plain language? Why not say the payment of poll tax shall be voluntary, or optional with the person liable? Why not say, no civil or criminal proceedings shall be allowable to collect it? If it be answered that this was not done because it would have freed solvent men from paying, we must then convict the convention of fraud and deception, in pretending to aid common schools by a poll tax intended not to be collected from the overwhelming majority of those on whom it was solemnly imposed to aid common schools. More than this, the constitution provides for main-

taining common schools at least four months in each year, and poll taxes are devoted to the purpose, and relied on as the means of support for schools, to be supplemented (helped out) by an appropriation from the state treasury. Manifestly, it was contemplated that common schools would be supported, in large part, by poll taxes (and they should be, and would be, if they were paid), and yet for years past the annual appropriation from the state treasury for the maintenance of common schools has been $923,500.

The journal of the constitutional convention shows that there was much controversy over $400,000 as a sum to be annually appropriated from the state treasury for common schools, and yet we have largely more than twice that sum annually appropriated, made necessary, in large part, by the uncollected poll tax imposed by the constitution. There is little doubt that the provision requiring the legislature to appropriate enough to supply the failure of the poll tax to maintain schools four months each year would never have become part of the constitution but for the imposition of the poll tax, and the promise that that would supply a large part of the means to maintain the schools the required time. And now we are told the poll tax was never intended to be paid, except voluntarily by the vast majority of those on whom it was imposed. The result is, that but a comparatively small part of the poll tax is collected, and almost a million of dollars must be annually supplied to make up the deficiency. No wonder the treasury is empty, with bonds sold and taxes increased.

The convention did not have reference to common law liens, for they were connected with and dependent on possession. They had no connection with taxes. Equitable and maritime liens were not in the mind of the convention certainly, for they were wholly inappropriate. Statutory liens must have been in view, and, bearing that in mind, there is no difficulty in concluding that "lien" was used in the sense in which it is used in the revenue law in force when the constitution was adopted.

The convention was dealing with revenue and providing for a school fund (to be added to as far as necessary by appropriation from the state treasury) by poll tax, and it must be convicted of folly (or deception, if it was contriving how the tax should not be collected) if it be concluded that it prohibited liability of nontaxable property for poll tax.

*Frank Johnston*, for appellee.

Section 243 is a part of the franchise article of the constitution of 1890. It levies a poll tax on male inhabitants, with enumerated exceptions, and provides that "said tax shall be a lien only upon taxable property," and "no criminal proceedings shall be allowed to enforce the collection of the poll tax." Upon the construction of the franchise article of the constitution the proposition which I submit to the court is that property exempt from taxation cannot be subjected in any manner to the payment of the poll tax.

The constitution must be construed to exempt nontaxable property from the payment, both upon a technical construction of its terms and upon a broader interpretation of its suffrage scheme, the purpose of these constitutional provisions in relation to the elective franchise to be ascertained and interpreted in the light of the condition of public affairs existing at the time of the adoption of the constitution. The state emerged in 1875, by a *quasi* revolution, from the rule imposed by the reconstruction acts of congress. With a large negro majority, elections were accompanied by disorders and race conflicts until the adoption of the present constitution. It is a part of the history of the state that the purpose of the legislature in calling the constitutional convention was to provide, within the limits of constitutional power, a scheme of suffrage that would secure an electoral body in the state from which the elements of ignorance and incompetency should be, as far as practicable, excluded. The debates in the convention disclose this as the primary and fundamental purpose of that body, and this was,

beyond all comparison, its most important and serious work. This explains the existence of these unusual provisions in the organic law.

The constitutional limitations on suffrage are an educational qualification, residence in the election precinct, and the payment of all taxes, including the poll tax, prior to the first day of February of the year of the election, for the two preceding years. It was supposed by the framers of the constitution that all these limitations, operating together, would accomplish the object in view. The design, in making the payment of the poll tax a qualification of the elective franchise, and then exempting nontaxable property from its payment, was to leave payment optional with that large class of voters who owned no taxable property, as an inducement to them not to vote. These considerations make it clear that the convention used the word "lien" in its broadest and most comprehensive signification, and did not limit the prohibition to a statutory lien, and the intention was to exempt nontaxable property entirely from the payment of the poll tax. It is used in the same sense as the terms "charge," "subjected to," or "answerable for," and the like, and this accords with the correct and technical definition of the word. *Sullivan* v. *Railroad Co.*, 4 Cliff., 225; *Hardy* v. *Norfolk Mfg. Co.*, 80 Va., 418; 2 Bouvier Law Dict., 47; 3 Parsons Contracts, 234; 13 Am. & Eng. Enc. L., 575, 603; *Ridgely* v. *Inglehart*, 3 Bland's Ch., 540; *Stepham* v. *Catholic Bishop of Chicago*, 2 Ill. App., 249; *Anderson* v. *State*, 23 Miss., 459. In its broadest sense, a lien is defined as "an obligation to or claim annexed or attaching to property, without satisfying which the property cannot be demanded or retained by the owner." *Ridgely* v. *Inglehart*, 3 Bland Md. Ch., 540; *Stepham* v. *Bishop of Chicago*, 2 Bradw. Ill., 249. "A lien at law is an implied obligation whereby real or personal property is bound for the discharge of some debt or engagement." Jones on Liens, sec. 4. It is a right to hold possession of an-

other's property for the satisfaction of some charge attached to it.   3 Parsons on Contracts, 234.

A lien exists solely for the purpose of securing payment of a debt out of particular property.   It is the qualified right which may be exercised over the property of another, though it is neither a *jus ad rem* nor a *jus in re*.   It may be given by statute or may arise from a levy upon the particular property.   An execution lien or a judgment lien is merely "a right to satisfaction of the judgment out of the property, superior to and in preference of any adverse interests subsequently acquired." *Buckner* v. *Pipes*, 56 Miss., 366, 367.

A lien is an implied obligation whereby property is bound for the payment of a debt.   It was used in this sense in the constitution.   This provision of the constitution is therefore to be read as if it declared "that the taxable property only of the person owing a poll tax shall be bound for its payment," which is the exact equivalent of saying that his nontaxable property shall not be so bound.   And, if not so bound, nontaxable property cannot be subjected to the payment of the poll tax.   The constitution expressly prohibits the creation of this obligation or claim on the nontaxable property of the poll tax debtor.   It declares, in effect, that he may keep or retain his nontaxable property without paying the poll tax.   The full force of this reasoning will be perceived when the distinction is observed between a lien and one of the ordinary consequences that is a right to prior satisfaction out of the property on which it rests.   If a lien is a prior one, it includes the right to prior satisfaction, but it is more than this.   It is a claim or charge as between the state and the debtor.   Where a lien exists, the taxpayer cannot retain the property without paying the tax. Where the lien is prohibited, there is absolutely nothing to prevent the taxpayer from retaining his property against the demands of the tax collector, which is but another form of saying that the nontaxable property cannot lawfully be subjected to the payment of the poll tax.

There is a wide difference between the case of the absence of a lien on property before its seizure and a constitutional provision prohibiting the creation of a lien on certain defined property for the payment of a particular kind of tax.   In the one case the debtor is under an obligation to apply all of his property which is not exempt from seizure to the discharge of his debts, and this obligation ripens into a lien when the property is levied upon, while in the other case there is no obligation whatever on the part of the taxpayer to apply the exempt property on which the creation of a lien is forbidden to the tax, for the provisions against the lien is a prohibition of any seizure of the property which would create a lien upon it.

It is conceded that the legislature is prohibited from making the poll tax a lien on nontaxable property, and the contention is that only statutory liens are prohibited by the constitution. This is fallacious, for the reason that the prohibition, by the very terms of the constitution, embraces all liens.   The framers of the constitution intended that a lien could not be created by statute or by levy. · The language is that the poll tax shall be "a lien only on taxable property," and the prohibition cannot, on any correct rule of construction, be restricted to one particular kind of a lien.   If the purpose of the constitution had been to limit the operation of the prohibition to statutory liens, it would have so provided in express terms.

Counsel for the appellant are in error in their contention that the poll tax was placed in the constitution primarily as a means of raising revenue for the public schools.   The poll taxes, it is true, when collected, become a part of the common school fund, but this wholly fails to explain the presence of the poll tax provision in the constitution.   The committee on education presented a proposition to the convention to impose a poll tax for the common school fund and make its payment compulsory, a proposition which was rejected by the convention.   Proceedings of the convention, pages 119–121, 122.

When it is seen that the provisions relating to the poll tax

form a part of the suffrage scheme of the constitution, and when their effect and operation under the construction contended for in behalf of the appellee are perceived and considered, the whole purpose of the convention becomes perfectly clear and intelligible. If the purpose of the constitution was to raise revenue for the public schools by levying a poll tax, impediments would not have been placed in the way of its collection. On the contrary, the convention would have left the legislature ample powers to enforce the collection of this tax by the most effectual methods. Prior to the adoption of the present constitution, nonpayment of the poll tax was a misdemeanor and punishable as such, and its payment was thus made compulsory. This proved a most effective method of enforcing its collection. The constitution of 1890 forbids any criminal proceeding for the collection of this tax, thus effectually securing the option to that class of voters who own only exempt property of not paying the poll tax, as an inducement to them not to vote.

It is true, as argued by counsel for the appellant, that the legislature may make the payment of the poll tax, in effect, compulsory by repealing the statute which exempts certain property from taxation, but this suggestion is without force. Such legislation would be merely an indirect if not an evasive means of impairing the purpose of the constitution, and the framers of the constitution must have reasonably presumed that the legislature would not abandon the just policy of exempting certain property from taxation for the indirect and evasive purpose of collecting the poll tax.

I respectfully submit that this court will uphold and preserve in its integrity a constitutional safeguard which has brought to the people of the state the blessings of peace and repose in place of the disorders and dangers that formerly attended the operation of unlimited suffrage.

*S. S. Calhoon,* on same side.

The constitutional convention refused to enact the report of

the committee on education, which report made the collection of the poll tax compulsory, and thus committed itself to the idea that the tax should not be coerced. Its purpose was to exclude ignorance from the ballot box, and not negroes.

Exemption of absolute necessaries from taxation has characterized our legislation from the beginning of the state government. The convention had the right to assume, and did assume, that this humane policy would continue. Surely as long as it does continue, it protects nontaxable property from a lien.

Our supreme court had defined a lien as "not a right to a thing nor in a thing, but the right to resort to a thing for satisfaction," and the constitution says, in effect, you cannot resort to nontaxable property for satisfaction. This it says by providing that there should be no lien upon it. It was never intended that the tax collector should strip every man naked, as appellant's construction of the revenue laws would require. If the tax collector is permitted to seize nontaxable property, a lien is created thereon by every authority. This the constitution says shall not be.

Argued orally by *Attorney-general Nash* and *J. A. P. Campbell*, for the appellant, and by *Frank Johnston* and *S. S. Calhoon*, for appellee.

COOPER, C. J., delivered the opinion of the court.

The appellant, the sheriff and tax collector of Hinds county, seized an article of household furniture, which is by law exempt from taxation, to coerce the payment of a poll tax due by the appellee. The appellee thereupon sued out a writ of injunction to restrain the sale of or further proceeding against said property, and, on final hearing, the injunction was made perpetual. From that decree the tax collector appeals.

There are no controverted facts in the case. It is admitted that the tax is due and unpaid and that the proceeding is, in all respects, regular, if the property seized by the officer was subject to be taken and sold for the tax. The question involved

is whether nontaxable property may be sold for the payment of poll taxes, and the solution of this question rests upon the construction of section 243 of our constitution, which is as follows: "A uniform poll tax of two dollars, to be used in aid of the common schools, and for no other purpose, is hereby imposed upon every male inhabitant of this state between the ages of twenty-one and sixty years, except persons who are deaf and dumb or blind or who are maimed by loss of hand or foot, said tax to be a lien only upon taxable property. The board of supervisors of any county may, for the purpose of aiding the common schools in that county, increase the poll tax in said county, but in no case shall the entire poll tax exceed, in any one year, three dollars on each poll. No criminal proceedings shall be allowed to enforce the collection of the poll tax." The question is, what is meant by that part of this section which declares "said tax to be a lien only upon taxable property," and this is determinable by the inquiry in what sense the word "lien" is employed.

For the tax collector it is contended that the word was used to designate that right or condition created and fixed by our then existing statutes, by which a charge or lien was given to the state and its counties upon all property assessed for taxes, which lien took relation back to the first day of February of the year in which the property was assessed and the tax levied, and by virtue of which the property, into whosesoever hands it might come, was liable to seizure and sale. This statutory lien, it is correctly argued, did not render the property in the hands of the owner to whom it was assessed liable to seizure for taxes, for this liability arose from the facts of his ownership and the assessment of the property and the levy of the tax thereon. And so it is contended that the purpose of the constitutional provision is simply to declare that no lien shall be created upon nontaxable property which would render it liable to the poll tax of the owner after it has passed into the hands of third persons.

For the appellee it is argued that the word "lien" is used in its broadest sense, and excludes not only the idea of a technical lien enforceable against third persons, but excludes also all right or power in the legislature or any executive officer or in any court to proceed against, to charge, or to subject nontaxable property to the payment of the poll tax.

Counsel for the respective parties press upon the attention of the court, with great earnestness, those matters which, if viewed alone, would lead to the one or the other construction contended for. In our opinion, they are all of importance, and are to be considered. In construing the constitution, we are to resort to such rules as would aid in the construction of a statute, keeping always in view the fact that while statutes descend into particulars and details, constitutions deal usually in generalities, and furnish along broad lines the framework of government. In *Daily* v. *Swope*, 47 Miss., 367, it was said: "The constitution is a law, differing only from a statute as it is of superior and paramount force, irrepealable by the legislature, and which prescribes where it conflicts with a statute. Where the framers of the constitution employ terms which, in legislative and judicial interpretation, have received a definite meaning and application, which may be more restricted or general than where employed in other relations, it is a safe rule to give to them that signification sanctioned by the legislative and judicial use." To find the true meaning of the language of the constitution, we are to look to the existing body of the law, whether common or statutory (Endlich on Inter. Stat., sec. 520), to former constitutions (*Alleghany* v. *Gibson*, 90 Penn. St., 397), to existing evils, to the objects and purposes to be accomplished, and to the remedies intended to be provided (Cooley on Const. Lim., 70; *People* v. *Chatauqua*, 43 N. Y.; Endlich on Inter. Stat., sec. 518).

We know that a large part of the property of this state has, for many years, been exempt from taxation. Since the year 1871, there has been exempt, among other things, the

wearing apparel of all persons, provisions on hand necessary for family consumption, all farming produce raised in this state in the hands of the producer, one gun, all poultry, household furniture not to exceed in value two hundred and fifty dollars, two cows and calves, ten head of hogs, ten head of sheep or goats, colts foaled in the state under three years old, farming utensils used for agricultural purposes, . . . the tools of any mechanic necessary for carrying on his trade, the libraries of all persons, and pictures and works of art not kept or offered for sale as merchandise."

The valuation of real and personal property for taxation, in the year 1880, was $165,847,334. If to this be added the assessed value of railroads in the state, approximately, $24,-000,000, we have total value of taxable property, $189,847,334. By the eleventh census of the United States the value of the agricultural products of this state for the year 1889 was given at $73,342,995. There were in the state in that year 144,310 farms. If to each farm it be assumed that there was of all other exempt property the value of $25, there would be $3,607,950 to be added, making a total valuation of property exempt from taxation of $76,950,945. Of this exempt property, probably fully one-half was in cotton, the staple agricultural product of the state, and this in the course of the year all passed out of the hands of the producer. There is great force therefore in the suggestion that the framers of the constitution did not intend to provide that one-third of the property of the state should be held as exempt from a tax imposed by the convention itself in aid of a cherished object—the common schools of the state—but only intended that the property should not be subjected after it had passed into the hands of third persons—innocent purchasers of our great staple.

But we are not to look to the existing statutes alone to determine in what sense the word "lien" was used. We are to consider the condition of things as existing at the time, and especially must we note those grave and permeating forces for

evil which were known by all men to exist, the silent and increasing influences of which were corrupting the public conscience and threatening to involve in common ruin the morals and civilization of our race and the liberty and safety of another.

It is not the province of this court to consider with whom rested the fault which gave origin to the conditions under which the convention was assembled. We deal with those conditions only as existing facts, forming a part of the history of the times. We consider them because we are seeking to discover the sense in which an ambiguous word was employed by the convention, and because, as existing facts, they cast a light upon the question under investigation. It cannot be doubted that the question involved in the proper settlement of the electoral franchise had been the subject of more reflection and thought, for a period of many years, than were bestowed upon all other subjects as to which our constitution underwent material change. Not only in this state, but throughout our sister states, thoughtful and anxious men turned upon the solution of the question all the light to be gathered from history or speculation. Our unhappy state had passed, in rapid succession, from civil war through a period of military occupancy, followed by another in which the control of public affairs had passed to a recently enfranchised race, unfitted by education or experience for the responsibility thrust upon it. This was succeeded by a semimilitary, semicivil uprising, under which the white race, inferior in number, but superior in spirit, in governmental instinct and in intelligence, was restored to power. The anomaly was then presented of a government, whose distinctive characteristic was that it rested upon the will of the majority, being controlled and administered by a minority of those entitled, under its organic law, to exercise the electoral franchise. The habitual disregard of one law not only brings it finally into contempt, but tends to weaken respect for all other laws. The most dangerous and insidious form in which this evil can exist is that which manifests itself in the disregard

of public, rather than of private, right; for not only are the consequences more widely diffused and less rapidly eradicated, but because no particular right of individuals is directly involved, resistance is less prompt, and the evil progresses to dangerous proportions before its existence is noted.

Not only was the question of the franchise a most difficult one for solution, by reason of its nature, but there was added to its treatment the limitations upon state action imposed by the amendments to the federal constitution. The difficulty, as all men knew, arose from racial differences. The federal constitution prohibited the adoption of any laws under which a discrimination should be made by reason of race, color or previous condition of servitude.

It would too much extend the volume of this opinion to enter upon a review and examination in detail of all the provisions of our recent constitution in which the subject of the electoral franchise, and the cognate one of the selection of governmental agencies, are dealt with. We deal with so much only as is necessary to a determination of the question involved.

He who reads the constitution of 1869 and that of 1890 will have his attention arrested by the marked differences in the number and character of the provisions upon the franchise, and the selection of the chief magistrate of the state.

The constitution of 1869, in its single article on the franchise, sec. 2, art. 7, provided simply that "all male inhabitants of this state, except idiots and insane persons, and Indians not taxed, citizens of the United States, or naturalized, twenty-one years old and upwards, who have resided in this state for six months, and in the county one month next preceding the day of election, at which said inhabitant offers to vote, and who are duly registered according to the requirement of section 3 of this article, and who are not disqualified by reason of any crime, are declared to be qualified electors." The governor and other state and county officers were, under this constitution, selected by popular election.

The corresponding article in the constitution of 1890, sec. 241, is as follows: "Every male inhabitant of this state, except idiots, insane persons, and Indians not taxed, who is a citizen of the United States, twenty-one years old and upwards, who has resided in this state for two years, and one year in the election district, or in the incorporated town or city, in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement or bigamy, and who has paid, on or before the first day of February of the year in which he shall offer to vote, all taxes which may have been legally required of him, and which he has had an opportunity of paying according to law, for the two preceding years, and who shall produce to the officers holding the election satisfactory evidence that he has paid said taxes, is declared to be a qualified elector; but any minister of the gospel, in charge of an organized church, shall be entitled to vote after six months' residence in the election district, if otherwise qualified."

By other provisions representation in the house and senate was apportioned among the counties and the counties were arranged in three groups, and the minimum representation to which each group should be entitled in the house was fixed, but it was provided that a reduction in the number of senators and representatives might be made by the legislature "if the same be uniform in each of said three divisions." To the election of the governor by the popular vote it is necessary that some person shall receive not only a majority of the popular vote, but also a majority of "electoral votes," which are votes distributed among the several counties in proportion to the number of representatives to which they are respectively entitled. If no person shall receive such majorities, then the house of representatives is required to choose a governor from the two persons who shall have received the highest number of popular votes. Constitution, secs. 254, 255, 256, 140, 141.

If we look at the map of the state and at the census reports showing the racial distribution of our population, and consider these in connection with the apportionment of the constitution, it will at once appear that unless there shall be a great shifting of populations, the control of the legislative department of the state is so fixed in the counties having majorities of whites as to render exceedingly improbable that it can be changed in the near future by the ordinary flow of immigration, or by the growth by births among our own people. The election of the chief executive of the state is also largely affected by the same means. It is in the highest degree improbable that there was not a consistent, controlling, directing purpose governing the convention by which these schemes were elaborated and fixed in the constitution. · Within the field 'of permissible action under the limitations imposed by the federal constitution, the convention swept the circle of expedients to obstruct the exercise of the franchise by the negro race. By reason of its previous condition of servitude and dependence, this race had acquired or accentuated certain peculiarities of habit, of temperament and of character, which clearly distinguished it, as a race, from that of the whites—a patient, docile people, but careless, landless, and migratory within narrow limits, without forethought, and its criminal members given rather to furtive offenses than to the robust crimes of the whites. ˙ Restrained by the federal constitution from discriminating against the negro race, the convention discriminated against its characteristics and the offenses to which its weaker members were prone. A voter who should move out of his election precinct, though only to an adjoining farm, was declared ineligible until his new residence should have continued for a year. Payment of taxes for two years at or before a date fixed many months anterior to an election is another requirement, and one well calculated to disqualify the careless. Burglary, theft, arson, and obtaining money under false pretenses were declared to be disqualifi-

cations, while robbery and murder, and other crimes in which violence was the principal ingredient, were not.

True, as argued by counsel, the provision is a revenue measure, for it imposes a tax. But it is also true that the payment of the tax is one of the qualifications of an elector, and the question is, whether its primary purpose is for revenue with incidental disqualification to vote attached upon its nonpayment, or whether the tax was levied primarily as an additional disqualification to those who should not pay it, with the incident of revenue derivable from those who should pay. It is to be noted that the section is a part of the article on franchise, and not of that on common schools, in aid of which the tax was levied, and where it would more appropriately be placed as a revenue measure. This is not of great importance, but is of some weight. When a constitution is submitted to the vote of the people and becomes operative only when adopted by them, we are aware of the rule that the debates of the convention and the journals, showing how and when amendments were introduced, and the course of procedure, are of little weight. The reason is, that under such circumstances it is not so much what the members of the convention thought or said upon a given subject as what the people intended to declare by adopting the instrument, that is material. But it must be remembered that our constitution was never submitted to the people. It was put in operation by the body which framed it, and therefore the question is what that body meant by the language used.

In this view the following history of the subject of poll taxes, as appearing in the journals of the convention, will cast some light upon the question involved. The poll tax was first suggested by some amendments offered by Mr. Calhoon, the president of the convention, of which three hundred copies were ordered to be printed, and the amendments were referred to the appropriate committees. The poll tax section was among the amendments relating to franchise, and, as offered, provided that its payment should be a prerequisite to entitle one to vote.

"No penalty, other than levy and sale of landed property, shall ever be exacted for its nonpayment." Journal, p. 38.

The seventh section of the article on education, as reported by the committee on that subject, was as follows: "The legislature shall levy a poll tax of two dollars a head in aid of the school fund, and for no other purposes, and the payment of said tax shall be made compulsory, under such conditions and exceptions as may be deemed best by the legislature." Journal, p. 121. As reported to the convention by the committee on franchise, the clause now under consideration read as follows: "Said tax to be a lien on taxable property." Journal, p. 135. As adopted it was in its present form. Journal, p. 228.

It is evident therefore that the convention had before it for consideration two antagonistic propositions—one to levy a poll tax as a revenue measure and to make its payment compulsory; the other to impose the tax as one of many devices for excluding from the franchise a large number of a class of persons, which class it was impracticable wholly to exclude and not desirable wholly to admit. In our opinion, the clause was primarily intended by the framers of the constitution as a clog upon the franchise, and, secondarily and incidentally only, as a means of revenue.

Having reached this conclusion, it follows, as a corollary, that when the language used is susceptible of two constructions, it must be so construed as to carry into effect the purpose of the convention.

It is evident that the more the payment of the tax is made compulsory, the greater will be the number by whom it will be paid, and therefore the less effectual will be the clause for the purpose it was intended. It cannot be denied that it was the purpose of the convention to declare a different rule in reference to property subjected to taxation and that which was exempt, and when we consider the fact that a very large proportion of those it was thought desirable to exclude from the exercise of the franchise owned no other property than that which

had for many years been exempted from taxation, the conclusion becomes irresistible that it was intended to leave the payment of the tax to the voluntary action of those who owned no other than nontaxable property.

Having reached this conclusion, it is not deemed necessary to examine and review the various statutes which have been brought to our attention. They were all brought forward into the code of 1892 from the code of 1880, which was enacted under our former constitution, in which there were no restrictions. They must now be confined in their operation to such property as is within the competency of the legislature to subject to seizure and sale.

*The decree is affirmed.*