UNITED STATES of America, Plaintiff,

v.

The STATE OF TEXAS et al., Defendants.

Civ. A. No. 1570.

United States District Court
W. D. Texas,
Austin Division.

Feb. 9, 1966.

Nicholas deB. Katzenbach, Atty. Gen., John Doar, Asst. Atty. Gen., Washington, D. C., Ernest Morgan, U. S. Atty., San Antonio, Tex., Stephen J. Pollak, 1st Asst. to Asst. Atty. Gen., Civil Rights Div., Washington, D. C., for plaintiffs.

John E. Clark, Trueman O'Quinn, Waggoner Carr, Atty. Gen. of Texas, Hawthorne Phillips, 1st Asst. Atty. Gen. of Texas, John Reeves, John H. Banks, Asst. Atty. Gen. of Texas, Doren R. Eskew, City Atty., Kenneth Jones, Asst. City Atty., Wallace Shropshire, Atty. for Travis County, Austin, Tex., for defendants.

Before BROWN and THORNBERRY, Circuit Judges, and SPEARS, District Judge.

THORNBERRY, Circuit Judge:

In this action the Attorney General of the United States challenges the validity of the Texas poll tax,[1] pursuant to the provisions of Section 10(b) of the Voting Rights Act of 1965, 79 Stat. 437, and 42 U.S.C. 1971(c). The United States seeks to show that the requirement of the payment of a poll tax as a precondition for voting in Texas is a device conceived primarily to deprive Negroes of the franchise and that it has continued to have that effect because the inadequate and disparate educational opportunity given Negroes until recent years by the State has placed them at an economic disadvantage and made the payment of the $1.75 poll tax a heavier burden on the Negro than on whites, in violation of the Equal Protection Clause. The United States also alleges that the Texas poll tax deprives Negroes of the right to vote under the Fifteenth Amendment and that, irrespective of any discrimination, it is invalid under the Due Process Clause since it does not have any adequate state justification and is in fact a restraint and a charge on the exercise of the fundamental right to vote. Although we find that the Texas poll tax is not violative of the Equal Protection Clause or the Fifteenth Amendment, for reasons which we shall discuss at length, we hold that the payment of a poll tax as a precondition to voting must fall as an unjustified restriction on one of the most basic rights guaranteed by the Due Process Clause.

I.

The United States Attorney General filed a complaint invoking the jurisdiction of this three-judge District Court under the provisions of the Voting Rights Act of 1965, § 10, 79 Stat. 442–443.[2] Jurisdiction is also asserted under

1. Similar suits are being prosecuted in Alabama, Mississippi and Virginia. United States v. Alabama, M.D.Ala. 1965, No. 225–N; United States v. Mississippi, S.D.Miss.1965, No. 3791; Harper v. Virginia State Board of Elections (Butts v. Harrison), E.D.Va.1964, 240 F.Supp. 270, appeal pending, 382 U.S. 806, 86 S.Ct. 94, 15 L.Ed.2d 57 (brought prior to Voting Rights Act of 1965, United States as amicus curiae).

2. Sec. 10(a) The Congress finds that the requirement of the payment of a poll tax as a precondition to voting (i) precludes persons of limited means from voting or imposes unreasonable financial hardship upon such persons as a precondition to their exercise of the franchise, (ii) does not bear a reasonable relationship to any legitimate State interest in the conduct of elections, and (iii) in some areas has the purpose or effect of denying persons

42 U.S.C. 1971,[3] 28 U.S.C. 1345[4] and 28 U.S.C. 2281.[5]

Standing to bring this suit is established by Section 10(b) of the Voting

the right to vote because of race or color. Upon the basis of these findings, Congress declares that the constitutional right of citizens to vote is denied or abridged in some areas by the requirement of the payment of a poll tax as a precondition to voting.

(b) In the exercise of the powers of Congress under section 5 of the fourteenth amendment and section 2 of the fifteenth amendment, the Attorney General is authorized and directed to institute forthwith in the name of the United States such actions, including actions against States or political subdivisions, for declaratory judgment or injunctive relief against the enforcement of any requirement of the payment of a poll tax as a precondition to voting, or substitute therefor enacted after November 1, 1964, as will be necessary to implement the declaration of subsection (a) and the purposes of this section.

(c) The district courts of the United States shall have jurisdiction of such actions which shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code and any appeal shall lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited.

3. Sec. 1971(a) (1) All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

 \* \* \* \* \*

(c) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. If in any such proceeding literacy is a relevant fact there shall be a rebuttable presumption that any person who has not been adjudged an incompetent and who has completed the sixth grade in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico where instruction is carried on predominantly in the English language, possesses sufficient literacy, comprehension, and intelligence to vote in any Federal election. In any proceeding hereunder the United States shall be liable for costs the same as a private person. Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by subsection (a) of this section, the act or practice shall also be deemed that of the State and the State may be joined as a party defendant and, if, prior to the institution of such proceeding, such official has resigned or has been relieved of his office and no successor has assumed such office, the proceeding may be instituted against the State.

(d) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law.

4. Sec. 1345. Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

5. Sec. 2281. An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

Rights Act of 1965 under which the Attorney General is "authorized and directed to institute forthwith * * * actions * * * against the enforcement of any requirement of the payment of a poll tax as a precondition to voting * * *" in areas where the requirement of such taxes denies or abridges the constitutional right of citizens to vote. The defendants are the State of Texas, the Judges of Election for Precinct Number 239 of Travis County, Texas, the Mayor of Austin, Texas, the Travis County Democratic and Republican Executive Committees and their Chairmen, and the Tax Assessor-Collector of Travis County, Texas.[6]

## II.

Although frequently thought of as a tax on the privilege of voting, the poll tax is actually a head tax. In this context, "poll" means "head" rather than the term customarily used to describe a place of voting.[7] The first poll tax in Texas, one dollar on white males from 21 to 55, was levied on June 12, 1837,[8] soon after Texas declared its independence from Mexico and became a Republic. From that time up until the Consti-

tutional Amendment in 1902, there was no relation between the poll tax and the right to vote.[9] Negroes were enfranchised in Texas in 1869[10] and became liable for the poll tax in 1870.[11] By 1870, there were 50,000 Negro and 60,000 white voters on the rolls. Proposals to make payment of the poll tax a qualification for voting were first raised in the 1875 Constitutional Convention[12] and frequently thereafter.[13] Finally, in 1901 the Texas Legislature, by Joint Resolution, proposed a constitutional amendment to make payment of the poll tax a prerequisite to voting,[14] and in 1902 the voters of Texas approved.[15]

We cannot improve on the following excellent summary of the Texas poll tax requirements found in the United States' brief: In order to vote in general, special and primary elections of the cities, counties and State, a person must be (1) twenty-one years old, (2) a citizen, (3) a resident of the State for one year and of the district or county in which the election is held for six months, and (4) a holder of a poll tax receipt, if liable for the tax.[16] The same preconditions apply to voting for federal officials except that the payment of poll taxes[17] has been pro-

6. The defendants other than the State of Texas were named because they typify officials throughout the State who have statutory duties in the enforcement of the poll tax.

7. Texas Legislative Council, Staff Research Report: A Survey of Taxation in Texas, Part IIB, 68 (1952) [hereinafter cited as Texas Legislative Council].

8. Laws of the Republic of Texas 1837, at 259, 262.

9. Texas Legislative Council, 71–73.

10. Tex.Const. art. III, § 1 (1869); Tex. Laws 1870, at 24.

11. Tex.Laws 1870, at 199.

12. Journal of the Constitutional Convention of 1875, at 238; Texas Legislative Council 72.

13. Texas Legislative Council 73. Proposals were introduced in the Texas Legislature in 1879 (Tex.Laws 1879, at 46; Tex.H.Jour. 1879, at 716); in 1883 (Tex. H.Jour. 1883, at 716); in 1889 (Tex.H. Jour. 1889, at 588); in 1891 (Tex.H.Jour.

1891, at 59); in 1895 (Tex.H.Jour. 1895, at 40); in 1899 (Tex.H.Jour.1899, at 445); and finally in 1901 as a proposed amendment to the Texas Constitution (Tex.H.Jour.1901, at 56, 59, 175; Tex.S.Jour. 1901, at 29).

14. Tex.S.Jour.1901, at 29; Tex.H.Jour. 1901, at 175.

15. Tex.S.Jour.1903, at 877.

16. Tex.Const. art. VI, § 2, Tex. Election Code art. 5.02 (Supp.1965).

17. U.S.Const. amend. XXIV:
Sec. 1. The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.
Sec. 2. The Congress shall have power to enforce this article by appropriate legislation.
A poll tax receipt for federal elections must be obtained during the same peri-

hibited by the adoption of the Twenty-Fourth Amendment. Insane persons, paupers supported by the county and persons convicted of a felony whose civil rights have not been restored are disqualified from voting.[18]

The poll tax is imposed on all residents of the State between the ages of twenty-one and sixty as of January 1 of the tax year.[19] The amount of the tax is $1.50,[20] but counties are authorized to require payment of an additional $.25 to defray the cost of collection. In addition, cities are authorized to impose a poll tax [21] of $1.00 as a precondition to voting in city elections. The tax must be paid between October 1 of the tax year and January 31 of the following year.[22] The deadline for payment precedes general elections in November by nine months. The Texas Constitution allocates one dollar of the tax to public education.[23]

Persons over the age of sixty on January 1 of the tax year are exempt from the tax,[24] but, if they live in a city of over 10,000 population, they must obtain "overage" certificates of exemption during the same four-month period that poll taxes are paid.[25] Persons over sixty who live in small towns or rural areas are allowed to vote without paying poll taxes or procuring a certificate of exemption.

Persons who became 21 after the beginning of the tax year but before the election, regardless of the population of the area of residence, must obtain a certificate of exemption at least thirty days before the election.[26] The same rule applies to persons who become residents of the State after January 1 of the tax year.[27]

Poll taxes are paid to and certificates of exemption are issued by the County Tax Assessor-Collectors who are agents of the State for this purpose.[28] Payment of poll taxes may be tendered in person or mailed, and, in either case, payment may be made by the taxpayer himself or by certain close relatives.[29] The taxpayer must use his own money to pay the tax, since wilfully loaning or advancing money to another person for poll tax payment is punishable by a $500 fine.[30]

A County Tax Assessor-Collector "may at such places as shall in his discretion be necessary or advisable" appoint deputies for the purpose of accepting poll tax payments and issuing certificates of exemption.[31] In counties containing a city of 10,000 or more inhabitants, other than the county seat, provision is made by statute for a poll tax deputy to accept payments and issue exemption certificates in the city, but only during the month of January.[32] These statutes ap-

od that regular poll taxes are collected. The receipt, generally marked "Poll Tax Not Paid," is honored for federal elections only. Tex. Election Code art. 5.02a (Supp.1965).

18. Tex.Const. art. VI, § 1; Tex. Election Code art. 5.01 (Supp.1965).

19. Tex.Gen.Tax Code art. 2.01 (Supp. 1965); Tex. Election Code art. 5.02 (Supp.1965). Imposition of a poll tax by the legislature is expressly authorized by the Texas Constitution. Tex.Const. art. VIII, § 1.

20. The tax is limited to $1.00 for insane and blind persons, persons suffering from certain permanent physical disabilities, and members of the active State militia. Tex.Gen.Tax Code art. 2.01 (Supp.1965); Tex. Election Code art. 5.02 (Supp.1965).

21. Tex.Rev.Civ.Stat. art. 1030 (1963).

22. Tex. Election Code art. 5.09 (Supp. 1965).

23. Tex.Const. art. VII, § 3. The remaining $.50 is allocated for general revenue purposes. Tex. Election Code art. 5.09 (Supp.1965).

24. Tex. Election Code art. 5.09 (Supp. 1965).

25. Tex. Election Code art. 5.16 (Supp. 1965).

26. Tex. Election Code art. 5.17 (Supp. 1965).

27. Ibid.

28. Tex. Election Code arts. 5.11–6.12 (Supp.1965).

29. Ibid.

30. Tex. Penal Code art. 204 (1952).

31. Tex. Election Code art. 5.11 (Supp. 1965).

32. Tex. Election Code art. 5.19 (1952).

pear to be the only provisions of Texas law related directly to procedures for the assessment and collection of poll taxes. The State Comptroller has broad statutory authority to prescribe forms and issue instructions to County Tax Assessor-Collectors,[33] and has issued a manual containing forms and instructions relating to assessment, collection and record-keeping procedures for various State taxes.

Texas does not have a separate system for registration of voters. At the time he pays his poll taxes, a prospective voter is required to show that he satisfies the voting preconditions of age, citizenship and residence. This information is recorded on his poll tax receipt, a copy of which is retained for use by the Tax Assessor-Collector in compiling lists of qualified voters.[34] Before April 1 of each year, the Tax Assessor-Collector of each county is required to compile and certify lists of the names of qualified voters, by election precinct, who have paid their poll taxes or received certificates of exemption during the statutory four-month period.[35] These lists are ultimately transmitted to the precinct judges of election.[36] With certain minor exceptions,[37] only persons whose names appear on such lists or on supplemental lists are allowed to vote.[38]

III.

The United States urges a number of theories as the basis of its attack on the constitutionality of the poll tax. It contends that the State of Texas by failing to provide Negroes with educational opportunities equivalent to those given to white students has limited their income-producing potential and that, as a result, the payment of the poll tax is a more difficult burden on the Negro than on the non-Negro. This disparity of educational and economic opportunity when coupled with a historical structure of social and political segregation is asserted to have deprived Negroes of the equal protection of the law guaranteed by the Fourteenth Amendment.

To establish this theory, the United States offered evidence of the relationship between educational level and income potential and statistics showing the inferior educational and vocational training formerly provided Negroes. Charts and figures were presented to show the disparity in annual instructional expenditures per pupil, in teacher salaries, in

---

33. Tex.Rev.Civ.Stat. art. 7201 (1960).

34. Tex. Election Code arts. 5.14, 5.16 (Supp.1965).

35. In addition, the County Tax Assessor-Collectors are required to file a monthly report with the State Comptroller during the four-month poll tax season (October through January). The form for this report is prescribed by the State Comptroller and reflects the number of poll taxes paid and certificates of exemption issued during the monthly reporting period.

36. Tex. Election Code art. 5.22 (Supp. 1965).

37. Persons who pay poll taxes in one county and thereafter move to another county or to another election precinct in the same county may, upon complying at the polls with certain conditions, vote in the precinct of their new residence, even though their names do not appear in the precinct list of qualified voters. This procedure does not apply to persons who move into or change election districts within a city of over 10,000 population. Such persons must present their poll tax receipts, certificates of exemption, or affidavits of loss thereof to the Tax Assessor-Collector and have their names added to the list of qualified voters. Tex. Election Code art. 5.15 (Supp.1965).

As noted supra, p. 239, persons over 60 who live in small towns and rural areas are not required to pay poll taxes or procure certificates of exemption.

38. If a judge of election allows a person to vote whose name is required to be listed but is not so listed, the judge is subject to a $500 fine. Tex. Penal Code art. 216 (1952).

number of pupils per teacher and in the value of school property and equipment.[39]

As evidence of the effect of the poll tax on Negroes, the United States submitted statistics on the number of whites and Negroes between the ages of 21 and 60 who actually paid the poll tax as compared to the total number of potentially eligible voters of each race. Their figures for 187 out of 254 counties showed that 57.3% of the eligible whites paid the poll tax in 1964, while 45.3% of the eli-

39:

### TEXAS STATE TOTALS

#### Yearly Instructional Expenditures Per Pupil

| | White | Negro |
|----------|--------|--------|
| 1930–31 | $ 43 | $ 20 |
| 1934–35 | 36 | 18 |
| 1940–41 | 47 | 26 |
| 1946–47 | 80 | 62 |
| 1952–53 | 175 | 133 |
| 1956–57 | 205 | 190 |

#### Teacher Salaries

| | White | Negro |
|----------|---------|---------|
| 1930–31 | $1033 | $ 623 |
| 1934–35 | 900 | 557 |
| 1940–41 | 1140 | 704 |
| 1946–47 | 1905 | 1521 |
| 1951–52 | 1707 | 1640 |

#### Number of Pupils Per Teacher—Average Daily Attendance

| | White | Negro |
|----------|--------|--------|
| 1930–31 | $ 24 | $ 31 |
| 1934–35 | 25 | 31 |
| 1940–41 | 24 | 27 |
| 1946–47 | 24 | 25 |
| 1954–55 | 22 | 22 |
| 1960–61 | 21 | 22 |

#### Number of Pupils Per Teacher—Enrollment

| | White | Negro |
|----------|--------|--------|
| 1930–31 | $ 32 | $ 44 |
| 1934–35 | 31 | 41 |
| 1940–41 | -- | -- |
| 1946–47 | -- | -- |
| 1954–55 | 25 | 26 |
| 1960–61 | 23 | 25 |

#### Value of School Property and Equipment Per Year Per Child

| | | White | Negro |
|----------|-----------|---------|--------|
| 1930–31 | Property | $ 149 | $ 38 |
| | Equipment | 7.10 | 1.28 |
| 1935–36 | Property | 159 | 55 |
| | Equipment | 9 | 2 |
| 1940–41 | Property | 201 | 64 |
| | Equipment | 14 | 3 |
| 1945–46 | Property | 225 | 75 |
| | Equipment | 22 | 6 |

gible Negroes paid.[40] The United States contends that this variation of 12% demonstrates the discriminatory effect of the poll tax on Negroes whose income potential has been stymied by lack of educational opportunity.

The United States also argues that, aside from considerations of race, the poll tax necessarily discriminates against the poor, denying them equal protection of the law. To support this contention, the United States offered evidence that one purpose of the adoption of poll tax payment as a precondition for voting was to disenfranchise the poor who formed the backbone of the Populist Party.[41] The deposition of Mollie Orshansky, an expert on poverty, was introduced to show that, for persons living "below the poverty line,"[42] the poll tax fee must compete

with the basic necessities of life, placing a substantial handicap upon the poor's exercise of the right to vote.[43]

As evidence that the purpose and effect of the Texas poll tax is to discriminate against Negroes in violation of the Fifteenth Amendment, the United States traced the historical development of the poll tax as a prerequisite to voting in the State of Texas. Although various theories have been advanced to explain the passage of the 1902 constitutional amendment making payment of the poll tax a prerequisite for voting, the United States submitted excerpts from speeches of proponents and opponents of the amendment, from newspaper articles and editorials and from the comments of historians to show its discriminatory objective.[44]

40. The State asserted that 55.9% of the white population over 21 had qualified to vote and that 50.2% of the Negroes over 21 years had so qualfied. The discrepancy between these figures may be explained by the State's inclusion in its calculations of those who received free poll taxes and exemptions—*i.e.*, those who had just reached 21 years of age, those over 60 years of age and those who received the free Federal poll tax receipts.

41. See *infra*, p. 243.

42. The "poverty line" is defined in relation to calculations of a minimum adequate level of living.

43. Miss Orshansky estimated that at least 600,000 Texans between the ages of 21 and 59 are living below the poverty line.

44. Delegates to the Constitutional Convention:

Delegate Mills "said he understood this as a thrust against the colored men, and was a violation of their rights." State Gazette (Austin, Texas), Oct. 7, 1875, quoted in McKay, The Texas Constitutional Convention of 1875, at 168.

Delegate Weaver contended:

"Neither do I consider it an argument of any value, that it might deprive the colored man of the right of suffrage. This is not an argument to me. I believe in the supremacy of the Anglo-Saxon race above negroe * * * but * * * I believe that the negroes, as Mr. Mills has said, will sell their hats, boots, and shoes to pay their tax and qualify themselves

for the polls and will struggle to the last. Nay, I do not know but that some of them would even steal to get enough to pay their poll tax and vote."
State Gazette (Austin, Texas), Oct. 14, 1875, quoted in McKay, The Texas Constitutional Convention of 1875, at 171.

According to Judge Ballinger, also a delegate to the Convention:

"They had proposed a poll tax, intending merely, whatever they might say to the contrary, to reach the colored people and make it a fundamental condition of suffrage * * *. Whatever argument might be used in its defense, the clause was simply a restriction on the right of suffrage of the poor people of the State."
State Gazette (Austin, Texas), Oct. 8. 1875, quoted in McKay, The Texas Constitutional Convention of 1875, at 181.
Newspaper articles and editorials:

"It remains to be seen what effect the adoption of this amendment will have on the suffragists of Texas. It is asserted by some that its obstensible object of increasing the revenues of the State will not be realized; that, in fact, the prime movers in this piece of legislation never had the object of adding to the revenues of the State in view and that their real purpose was to disfranchise the shiftless element of voters."
San Antonio Daily Express, Nov. 8, 1902, p. 1, col. 5.

"Are those who pay nothing toward the support of the government the peers of those who do? Has the drone the right to share equally the privileges of the industrious? Must the low groveling equal-

Insight into the motives of Texas voters can be gained, the United States contends, by viewing the Texas amendment as part of the Southern movement to use the poll tax rather than intimidation to disfranchise the Negro.[45] Between 1889 and 1902, ten Southern states made the poll tax a prerequisite for voting.[46] Florida led off in 1889,[47] followed by Mississippi [48] and Tennessee [49] in 1890, Arkansas [50] in 1892, South Carolina in 1895,[51] Louisiana in 1898,[52] North Carolina in 1900,[53] Alabama in 1901,[54] Virginia [55] and Texas in 1902, and Georgia [56] in 1908.

A 1952 Staff Report to the Texas Legislative Council [57] concluded that:

No single factor accounts for acceptance of the poll tax as a prereq-

before-the-law, lazy, purchaseable negro, who pays no taxes, have the privilege of neutralizing the vote of a good citizen and taxpayer?"
Houston Telegraph, Oct. 10, 1875, quoted in McKay, Debates of the Texas Constitutional Convention of 1875, at 98.
Scholars and Historians:
Professor Frederic D. Ogden, the leading student of the poll tax, concluded that the "use of the poll tax in the South for suffrage restriction dates back primarily to the period from 1890 to 1908. * * * It is obvious that one reason why southern states adopted the poll tax and other suffrage restrictions in the period from 1890 to 1908 was to disfranchise the Negro. * * * In Mississippi, payment of the tax was made a voting prerequisite largely because of the belief that whites would be more apt to pay it than Negroes. The situation was similar in Texas."
Ogden, The Poll Tax in the South 2, 4–5, 7 (Univ. Ala. Press 1958) (footnotes omitted), cited in Harman v. Forssenius, 1965, 380 U.S. 528, 529, 539, 540, 85 S.Ct. 1177, 14 L.Ed.2d 50.

45. Ogden, op. cit. supra, note 44, at 5, 7–10, 30–31.

46. Texas Legislative Council 70.

47. Fla.Laws 1889, ch. 3859 at 31.

48. Miss.Const. §§ 241, 243 (1890); Miss. Code §§ 3160–63 (1942). The Supreme Court of Mississippi has explicitly acknowledged that the State's poll tax was intended to "obstruct the exercise of the franchise by the negro race." Ratliff v. Beale, 1896, 74 Miss. 247, 266–267, 268, 20 So. 865, 868, 34 L.R.A. 472.

49. Tenn.Acts 1890, ch. 26, at 67.

50. Ogden, op. cit. supra, note 44, at 2–3.

51. Ibid. Ogden relates that at the South Carolina Constitutional Convention of 1895 which adopted the tax, Benjamin R. Tillman decried Negro voting and stated the Convention's purpose to be "to put such safeguards around the ballot in the future to so restrict the suffrage and circumscribe it, that this infamy can never come about again." Id. at 5–6.

52. According to Ogden, the President of the Louisiana Constitutional Convention that adopted the tax commented of the new Constitution: "Doesn't it let the white man vote, and doesn't it stop the negro from voting, and isn't that what we came here for? (applause)" Id. at 6 Footnotes omitted.).

53. Id. at 3.

54. The author described the debate on the tax at the Alabama Constitutional Convention of 1901:
"One of the delegates in the Alabama Convention stated that he believed that the poll tax would disfranchise ten Negroes to one white man. Another delegate, who approved using the revenue for educational purposes, thought that the tax would both disfranchise Negroes and educate white children. Other members of this convention regarded the poll tax as the primary solution for their suffrage problem, frequently stated to be that of disfranchising the Negro without at the same time disfranchising any whites." Id. at 6 (Footnotes omitted.).

55. Va.Const. §§ 18, 20–22, 35, 38, 173. Ogden also quotes a delegate-supporter of the poll tax at that convention: "It will not do away with the negro as a voter altogether, but it will have the effect of keeping numbers of the most unworthy and trifling of that race from the polls. I do not know of anything better in view of the fifteenth amendment." Ogden, op. cit. supra, note 44, at 7.

56. Ga.Acts 1908, at 27.

57. The Texas Legislative Council is an organ of the State Legislature composed of fifteen legislators, the Speaker of the House and the President of the Senate and operates pursuant to State law with a professional staff. Tex.Rev.Civ.Stat. art. 5429b (1958).

uisite for voting. Obviously, the movement had been underway a long time, and such an issue, constantly pressed, has a way of eventually gaining public favor. However, it would appear that at least three important elements were involved. In the first place, there was the desire to purify the ballot. This was one of the reasons most often advanced by supporters of the proposed constitutional amendment. Apparently, they felt that "vote-buying" and other fraudulent election practices would be substantially reduced by adding to the cost of vote-purchasing and by having more carefully regulated election administration. Second, there was a desire to disfranchise the Negro. And third, there was the essentially defunct Populist Party. The Populist or People's Party was an important element in the politics of many sections of the United States during the 1890's. The party was radical in its views and received its main backing from struggling farmers and from labor. This organization was anathema to many of the politicians of that day. Thus some proponents of a poll tax requirement for voting saw in it a method of disfranchising the people who had formed the backbone of the Populist Party.[58]

The State of Texas contends that there is no evidence that the poll tax in Texas discriminates against anyone because of race or economic status. The State notes that the poll tax is imposed on everyone between the ages of 21 and 60 and that, according to the Attorney General of the United States and the Voting Rights Commission of 1961, no voting discrimination exists in Texas. In his testimony before the Senate Judiciary Committee, the Attorney General made the following statements:

Could I say two things. One, that the Department of Justice and the Civil Rights Commission has never had one single complaint on voters' discrimination arising in the State of Texas. The point 2 that I want to make, a higher percentage of Negroes are registered in proportion to the Negro population of Texas than whites. 58 percent of the Negroes are registered; 56 percent of the whites are registered.

\* \* \* \* \* \*

Mexicans registered are even a higher percentage than the Negroes.[59]

The United States asserts that these figures should not be given weight since they were based on "estimates" made by the Southern Regional Council which have proved inaccurate in the light of the evidence assembled for this lawsuit.

The Civil Rights Commission of 1961 concluded that

The right to vote without distinctions of race or color—the promise of the 15th amendment—continues to suffer abridgment. Investigations, hearings, and studies conducted by the Commission since its 1959 Report indicate, however, that discriminatory disfranchisement is confined to certain parts of the country—indeed that it does not exist in 42 States. But in about 100

---

58. Texas Legislative Council 73 (Footnotes omitted).

The United States asserts that the tax was not linked to voting for the purpose or with the effect of increasing the number of payers. The percentage of those liable who were paying was rising before the tie to voting and, with rare exceptions, has declined since. Thus, 53.8% of those liable paid in 1896, but only 33.5% in 1950 and 42.3% in 1960.

59. Hearing on S. 1564 Before the Senate Committee on the Judiciary (Executive Session), vol. 2, at 117 (April 7, 1965).

counties in Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee, there has been evidence, in varying degree, of discriminatory disfranchisement.[60]

The United States claims that the definition of "discriminatory disfranchisement" did not include poll taxes and their effect, but was limited to overt and deliberate discrimination and that the Commission recommended that the Congress abolish the poll tax as a precondition to voting.

## IV.

In the light of the evidence assembled by the United States and the defendants, this Court hereby makes the following findings and conclusions:

■ (1) A primary purpose of the 1902 Amendment to the Texas Constitution making payment of a poll tax a precondition to the right to vote was the desire to disenfranchise the Negro and the poor white supporters of the Populist Party. The fact that the Amendment was conceived for this invidious purpose over half a century ago is not alone a sufficient reason today for declaring it unconstitutional.

■ (2) This Court acknowledges that a dual structure of society developed in post-Civil War Texas and has resulted in a denial of equal opportunities to the Negro. The disparity in state support of white and Negro education until recent years stands as the most vivid example of this dual structure and leaves a substantial proportion of the present adult Negro population as products of its discrimination.

(3) Even though the poll tax was established as a prerequisite for voting in part to disenfranchise the Negro and even though the Negro has been relegated to a position of second-class opportunity by policies of segregation and inadequate education, the evidence does not establish that the poll tax in Texas discriminates against Negroes in violation of the Fifteenth Amendment or the Equal Protection Clause.

■ The evidence clearly shows, and the United States does not dispute, that as least during the last twenty years there has not been any attempt to use the poll tax overtly to deprive the Negro of his right to vote. Despite unlimited pretrial discovery, no instances of outright discrimination have been shown or alleged. In fact, the United States has relied primarily on evidence of discrimination in public education and the resulting economic disadvantages to establish that the poll tax is more of a burden upon the Negro than upon the white voter. Although we consider the United States' method of proof a legitimate means for reaching such a conclusion, the facts will not support a finding of racial discrimination. The figures most favorable to the United States' position indicate that of the eligible persons between the ages of 21 and 60, 57.3% of the whites and 45.3% of the Negroes pay their poll tax. It is to be noted that both of these figures, although not commendable in terms of the total electorate, are subtantial and that the difference between them is only 12%. If the disparity had been larger, we might have been more inclined to accept the evidence of a historical background of discrimination and the result of the poll tax sales as sufficient to justify a finding that the poll tax discriminates against Negroes. The disparity, however, is not glaring. Indeed, it is relatively small. The evidence points to other possible reasons for this difference. In some counties, the percentage of both white and Negro voters paying the poll tax is substantially higher than the aver-

---

60. Civil Rights Commission, Report on Voting, book 1, at 133 (1961).

age,[61] while in others it is lower.[62] In a few counties, the percentage of Negro poll tax holders exceeds that of white poll tax holders.[63]

61:

Sample Counties Where Both White and Negro
Poll Tax Payments are Higher Than the Average

| County | Persons 21–59 (in 1960) | | Poll Tax Payers (1964) | | Percent of Persons 21–59 Paying Poll Tax | |
|---|---|---|---|---|---|---|
| | White | Negro | White | Negro | White | Negro |
| Angelina | 15,492 | 2,976 | 11,316 | 1,837 | 73.0 | 61.7 |
| Chambers | 3,911 | 936 | 3,035 | 690 | 77.6 | 73.7 |
| Hardin | 9,351 | 1,605 | 6,579 | 948 | 70.4 | 59.1 |
| Lee | 3,026 | 705 | 1,984 | 422 | 65.6 | 59.9 |
| Montgomery | 9,407 | 2,347 | 7,243 | 1,449 | 77.0 | 61.7 |
| Newton | 2,935 | 1,204 | 2,040 | 766 | 69.5 | 63.6 |
| Sabine | 2,339 | 711 | 1,766 | 493 | 75.5 | 69.3 |
| San Jacinto | 1,245 | 1,055 | 1,056 | 781 | 84.8 | 74.0 |

62:

Sample Counties Where Both White and Negro
Poll Tax Payments are Lower than the Average

| County | Person 21–59 (in 1960) | | Poll Tax Payers (1964) | | Percent of Persons 21–59 Paying Poll Tax | |
|---|---|---|---|---|---|---|
| | White | Negro | White | Negro | White | Negro |
| Coryell | 10,361 | 665 | 3,720 | 22 | 35.9 | 3.3 |
| El Paso | 139,752 | 5,430 | 50,376 | 817 | 36.0 | 15.0 |
| Potter | 51,362 | 3,589 | 20,499 | 1,417 | 39.9 | 39.5 |
| Walker | 7,407 | 3,208 | 2,924 | 1,239 | 39.5 | 38.6 |

63:

Sample Counties Where Negro Poll Tax
Payers Exceed Whites

| County | Persons 21–59 (in 1960) | | Poll Tax Payers (1964) | | Percent of Persons 21–59 Paying Poll Tax | |
|---|---|---|---|---|---|---|
| | White | Negro | White | Negro | White | Negro |
| Midland | 31,155 | 2,975 | 18,526 | 2,059 | 59.5 | 69.2 |
| Nacogdoches | 9,232 | 2,903 | 5,113 | 1,821 | 55.4 | 62.7 |
| Polk | 4,125 | 1,575 | 2,571 | 1,324 | 62.3 | 84.1 |
| Smith | 30,668 | 9,755 | 17,232 | 5,744 | 56.2 | 58.9 |
| Upshur | 6,489 | 1,921 | 4,453 | 1,515 | 64.9 | 78.9 |

Perhaps this is merely a reflection of the general apathy level in different parts of the State. A mere 84,297 persons out of a possible 1,495,988 eligible took advantage of the free federal exemptions. The figures available from a number of counties with heavy Negro population show a meager response to this opportunity to vote without paying the poll tax.[64] In spite of all the evidence submitted by the United States, there are still too many unknown variables which may reasonably explain the relatively small discrepancy between white and Negro payment of the poll tax.

(4) The United States asserts that the poll tax discriminates against the poor as a class. Certainly, we may assume any non-progressive tax results in a greater hardship on the poor than on the non-poor. The question, however, is whether the poll tax is an unconstitutional discrimination against the poor because of the harder burden its lays on them. Since we have held that the Texas poll tax is invalid under the Due Process Clause, we find it unnecessary to consider this contention.

## V.

Section 10(a) of the Voting Rights Act of 1965 states the Congressional finding that

the requirement of the payment of a poll tax as a precondition to

voting (i) precludes persons of limited means from voting or imposes unreasonable financial hardship upon such persons as a precondition to their exercise of the franchise, (ii) does not bear a reasonable relationship to any legitimate State interest in the conduct of elections, and (iii) in some areas has the purpose or effect of denying persons the right to vote because of race or color. Upon the basis of these findings, Congress declares that the constitutional right of citizens to vote is denied or abridged in some areas by the requirement of the payment of a poll tax as a precondition to voting.[65]

The Attorney General of the State of Texas contends that the members of Congress had no evidence to substantiate their findings in relation to the Texas poll tax. In support of this allegation, he offered letters from fifty-nine legislators who answered his inquiry. Fifty-eight of the fifty-nine stated that no evidence had been offered to support the findings as to Texas. The United States, however, submitted excerpts from the legislative history of the Voting Rights Act of 1965, the Twenty-Fourth Amendment and earlier poll tax bills to refute the State's contention. In part, these records show that Congress had evidence that of the six states with the lowest voter

64:

| County | Persons 21–59 (in 1960) | | Percent of Persons 21–59 Paying Poll Tax (in 1964) | | Persons Not Paying Poll Tax (in 1964) | | Federal Exemption Certificates | |
|---|---|---|---|---|---|---|---|---|
| | White | Negro | White | Negro | White | Negro | White | Negro |
| Brazoria | 33,111 | 4,562 | 70.5 | 35.1 | 9,783 | 2,960 | 135 | 0 |
| Galveston | 54,830 | 14,007 | 63.7 | 49.5 | 19,911 | 7,071 | 573 | 7 |
| Harris | 502,080 | 118,355 | 60.0 | 51.0 | 200,823 | 58,052 | 10,428 | 1,604 |
| Harrison | 12,225 | 7,482 | 64.6 | 36.9 | 4,328 | 4,721 | 59 | 23 |
| Jefferson | 94,278 | 25,894 | 63.6 | 48.1 | 34,292 | 13,435 | 495 | 116 |
| McLennan | 60,425 | 10,079 | 49.7 | 41.4 | 30,413 | 5,904 | 660 | 16 |
| Tarrant | 238,274 | 27,413 | 52.2 | 34.4 | 113,859 | 17,973 | 6,069 | 411 |
| Travis | 88,492 | 12,099 | 77.0 | 57.9 | 20,333 | 5,099 | 951 | 67 |

65. Voting Rights Act of 1965, § 10(a), 79 Stat. 442.

turnout in the 1964 elections, four have poll tax requirements;[66] Several Congressmen testified that poll taxes in Texas and in general were a burden on the poor and were discriminatory.[67] There was evidence before both the House and the Senate that the poll tax could not properly be justified as a qualification for voting[68] or as a revenue measure[69] and that historically it has been a device to disenfranchise the Negro.[70]

The Congress' experience with the poll tax was summarized recently by the Su-

66:

| State | Voting Age Population | Total Vote Cast— 1964 Presidential Election | Percentage of Voting Age Population |
|---|---|---|---|
| * Alabama | 1,915,000 | 689,818 | 36 |
| Georgia | 2,636,000 | 1,139,352 | 43 |
| * Mississippi | 1,243,000 | 409,146 | 33 |
| South Carolina | 1,380,000 | 524,748 | 38 |
| * Texas | 5,922,000 | 2,626,811 | 44 |
| * Virginia | 2,541,000 | 1,042,267 | 41 |

* Poll tax states.

Hearings Before a Subcommittee of the House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 2, at 29 (1965).

———◆———

67. See, e. g., Senator Ralph Yarborough, Texas, 111 Cong.Rec. 9573 (1965); Senator Birch E. Bayh, 111 Cong.Rec. 9704 (1965); and Senator Joseph D. Tydings, 111 Cong.Rec. 9696–97 (1965).

68. Nothing in the payment of a poll tax evidences one's "qualification" to vote. A man with a million dollars in the bank cannot vote if he fails to pay the tax; a man who steals a couple of dollars to pay the tax has met this condition. A poll tax has nothing in common with true "qualifications": Age (reflecting maturity of judgment); residency (reflecting knowledge of local conditions), etc. Once it is demonstated that the poll tax cannot be justified as a qualification for voting fixed by the States under article I of the Constitution, good cause for this restriction on the right to vote is hard to find.
H.R.Rep. No. 439, 89th Cong., 1st Sess. 22 (1965); see S.Rep. No. 162, 89th Cong., 1st Sess., pt. 3, at 34 (1965), U.S. Code Cong. & Ad. News, p. 2437.

69. "No one seriously contends that it is a revenue measure. Forty-six states deem it unwise." H.R.Rep. No. 439, 89th Cong., 1st Sess. 22 (1965).
Senator Edward M. Kennedy of Massachusetts provided the following statistics on public education revenues, 111 Cong. Rec. 9577 (1965):

Further evidence to show that States could not be possibly reliant upon these taxes can be seen from the fact that in 1954, for example, Alabama spent almost $95 million for its schools and collected half a million dollars in poll taxes; in 1955 Mississippi spent $26 million on its schools and collected half a million dollars in poll taxes; while Texas, spending over $205 million for free schools and vocational education, received only $1,400,000 of poll tax revenue available for these schools; and Virginia in 1954 spent $67.7 million for schools, collecting only $972,000 from poll taxes.

70. The 1965 Senate Committee Report quoted the following statements from a 1943 Report of the Senate Judiciary Committee:
We think a careful examination of the so-called poll tax constitutional and statutory provisions, and an examination particularly of the constitutional conventions by which these amendments became a part of the State laws, will convince any disinterested person that the object of these State constitutional conventions, from which emanated mainly the poll tax laws, were motivated entirely and exclusively by a desire to exclude the Negro from voting.
S.Rep. No. 162, 89th Cong., 1st Sess., pt. 3, at 33 (1965).

preme Court in Harman v. Forssenius, 1965, 380 U.S. 528, 538–540, 85 S.Ct. 1177, 1184–1185, 14 L.Ed.2d 50:

Prior to the proposal of the Twenty-fourth Amendment in 1962, federal legislation to eliminate poll taxes, either by constitutional amendment or statute, had been introduced in every Congress since 1939. The House of Representatives passed anti-poll tax bills on five occasions and the Senate twice proposed constitutional amendments. Even though in 1962 only five States retained the poll tax as a voting requirement, Congress reflected widespread national concern with the characteristics of the tax. Disenchantment with the poll tax was many-faceted. One of the basic objections to the poll tax was that it exacted a price for the privilege of exercising the franchise. Congressional hearings and debates indicate a general repugnance to the disenfranchisement of the poor occasioned by failure to pay the tax. * * * Another objection to the poll tax raised in the congressional hearings was that the tax usually had to be paid long before the election—at a time when political campaigns were still quiescent—which tended to eliminate from the franchise a substantial number of voters who did not plan so far ahead. The poll tax was also attacked as a vehicle for fraud which could be manipulated by political machines by financing block payments of the tax. In addition, and of primary concern to many, the poll tax was viewed as a requirement adopted with an eye to the disenfranchisement of Negroes and applied in a discriminatory manner. (Footnotes omitted).

■ ■ As the Supreme Court noted in Block v. Hirsh, 1921, 256 U.S. 135, 154, 41 S.Ct. 458, 459, 65 L.Ed. 865:

No doubt it is true that a legislative declaration of facts that are material only as the ground for enacting a rule of law * * * may not be held conclusive by the Courts. * * * But *a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect.* (Emphasis added.)

In the light of the numerous bills affecting the poll tax during the last twenty-five years, the public attention focused on this controversial topic, the special acquaintance of legislators with all aspects of voting, and the fact that Congress is not confined to the type of evidence which would be admissible in a court, there can be little doubt that there was sufficient evidence before Congress from which it could make the findings found in Section 10(a) of the Voting Rights Act. "[T]he Legislature, acting within its sphere, is presumed to know the needs of the people of the state * * * and this presumption cannot be overthrown, as it has been sought to be overthrown, by testimony of individual legislators * * * " or by the letters submitted in this case. Townsend v. Yeomans, 1937, 301 U.S. 441, 451, 57 S.Ct. 842, 81 L.Ed. 1210. See Clark v. Paul Gray, Inc., 1939, 306 U.S. 583, 594, 59 S.Ct. 744, 83 L.Ed. 1001. There being a rational basis for the Congressional findings, we deem them worthy of "great respect" in determining the validity of the poll tax requirement for voting.

We have also taken note of the mandate of Section 10(c) of the Voting Rights Act of 1965 that "it shall be the duty of the judges designated to hear the case to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited" and, with the excellent cooperation of counsel on both sides, have endeavored to comply with it.

### VII.

"The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle

of our constitutional system." Stromberg v. People of State of California, 1931, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117. Yet how ineffective is this "political discussion" protected by the First Amendment if its ultimate objective can be denied at the ballot box.

Even though not specifically mentioned in the Constitution, the right to vote clearly constitutes one of the most basic elements of our freedom—the "core of our constitutional system." Carrington v. Rash, 1965, 380 U.S. 89, 96, 85 S.Ct. 775, 13 L.Ed.2d 675. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." Wesberry v. Sanders, 1964, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481. See Harman v. Forssenius, 1965, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50; Carrington v. Rash, supra; Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. It would be ironic, indeed, if the Constitution did not protect the right to vote, since that right has long been acknowledged to be "preservative of all rights." Yick Wo v. Hopkins, supra, at 370, 6 S.Ct. at 1071.

The Supreme Court "has never held that the Bill of Rights or the Fourteenth Amendment protects only those rights that the Constitution specifically mentions by name." Griswold v. State of Connecticut, 1965, 381 U.S. 479, 486 n. 1, 85 S.Ct. 1678, 1683, 14 L.Ed.2d 510 (concurring opinion, Goldberg, J.). Among the many rights which have been found to be constitutionally protected though not expressly mentioned in the Constitution are: the right to marital privacy, Griswold v. State of Connecticut, supra; the right to travel, Kent v. Dulles, 1958, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204; Aptheker v. Secretary of State, 1964, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992; the right to educate one's children as one chooses, Pierce v. Society of Sisters, 1925, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, and the "freedom to associate and privacy in one's associations." NAACP v. State of Alabama, 1958, 357 U.S. 449, 462, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488. While some rights have been found to be implicit in one or more of the first nine amendments to the Constitution (see, e. g., Griswold v. State of Connecticut, supra; NAACP v. State of Alabama, supra), others have found protection within the concept of "liberty" in the due process clauses of the Fifth and Fourteenth Amendments (see, e. g., Kent v. Dulles, supra; Pierce v. Society of Sisters, supra).

■■ To determine whether a right is protected by the due process clause, a court

must look to the "traditions and [collective] conscience of our people" to determine whether a principle is "so rooted [there] * * * as to be ranked as fundamental." Snyder v. Com. of Massachusetts, 291 U.S. 97, 105 [54 S.Ct. 330, 332, 78 L.Ed. 674]. The inquiry is whether a right involved "is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' * * *." Powell v. State of Alabama, 287 U.S. 45, 67 [53 S.Ct. 55, 63, 77 L.Ed. 158]

Griswold v. State of Connecticut, supra, 381 U.S. at 493, 85 S.Ct. at 1686 (concurring opinion, Goldberg, J.).

■ When measured against these standards and examined in the light of Supreme Court pronouncements describing it as our most "precious" right, Wesberry v. Sanders, 1964, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481, and as the "essence of a democratic society," Reynolds v. Sims, 1964, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506, it cannot be doubted that the right to vote is one of the fundamental personal rights included within the concept of liberty as protected by the due process clause.

## VIII.

In Texas, the right to vote is denied to those who have not paid the poll tax or

obtained an exemption. As stated by the Supreme Court

> fundamental personal liberties * * * may not be abridged by the States simply on a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling," Bates v. City of Little Rock, 361 U.S. 516, 524 [80 S.Ct. 412, 417, 4 L.Ed. 2d 480]. The law must be shown "necessary, and not merely rationally related, to the accomplishment of a permissible state policy." McLaughlin v. State of Florida, 379 U.S. 184, 196 [85 S.Ct. 283, 290, 13 L.Ed.2d 222]. See Schneider v. State of New Jersey, Town of Irvington, 308 U.S. 147, 161 [60 S.Ct. 146, 151, 84 L.Ed. 155].

Griswold v. State of Connecticut, 1965, 381 U.S. 479, 497, 85 S.Ct. 1678, 1688 (concurring opinion, Goldberg, J.). Thus, we must determine whether the Texas poll tax as a restraint on the right to vote may be upheld as "necessary * * * to the accomplishment of a permissible state policy."

The tying of the payment of a head tax to the exercise of the franchise has been rationalized in a number of ways since the days of its first proponents. As this Court has found, one of the prime purposes of the 1902 Amendment to the Texas Constitution was to disenfranchise the Negro and the poor white supporters of the Populist Party. Needless to say, that objective cannot now be used to justify the poll tax as a prerequisite to voting. Other advocates have suggested that the poll tax requirement (1) purifies and protects the ballot, (2) serves as a registration device, (3) limits the electorate to those interested enough to buy a poll tax and competent enough to accumulate the $1.75, and (4) is a legitimate method of enforcing an otherwise valid tax. In weighing these possible justifications, this Court must be sure that, when the State attempts to achieve a legitimate end, it does not use means "which sweep unnecessarily broadly and thereby invade the area of protected freedoms." NAACP v. Alabama, ex rel. Flowers, 1964, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325; Griswold v. State of Connecticut, supra, 381 U.S. at 485, 498, 85 S.Ct. at 1682, 1689. "[I]n an area so closely touching our most precious freedoms," "precision of regulation must be the touchstone * * * ," NAACP v. Button, 1963, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed. 2d 405; Griswold v. State of Connecticut, supra, 381 U.S. at 498, 85 S.Ct. at 1689 and "the breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose." Shelton v. Tucker, 1960, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231.

 Under the stringent requirements of these constitutional standards, none of the suggested justifications may be sustained. Purification and protection of the ballot may be accomplished by other means as the State of Texas has recognized by the passage of numerous penal provisions.[71] Indeed, the continu-

---

71. Under the Texas Penal Code it is a crime for an election official to intimidate a voter (art. 220); to refuse to permit voters to vote (art. 217); to influence voters (art. 218); to permit alteration or premature removal of ballots (art. 219); to compare the executed ballot with the voter list (art. 221); to change a ballot (art. 223); to fail to secure the ballots (art. 226); to make a false canvass (art. 227); or to make a false certificate (arts. 228, 229). A person voting illegally is subject to a five-year pentitentiary sentence (art. 232). It is a crime to institgate illegal voting (art. 233); to swear falsely as to qualifications to vote (art. 234); to procure a voter to swear falsely (art. 235); to procure an illegal vote (art. 237); to falsely impersonate another (art. 239); or to vote more than once (art. 241). A person altering or destroying ballots faces a five-year penitentiary sentence (art. 244). Riots, unlawful assembly and misconduct at elections are crimes (arts. 253–261).

ing occurrence of vote-buying prosecutions would indicate that the poll tax requirement has not even been an effective device for protecting the purity of the ballot.[72]

■ Although the poll tax system in Texas does serve as a substitute for a registration system, it is difficult to comprehend the necessity of collecting $1.75 merely to register potential voters, especially since only a portion of those qualified are required to pay the tax. As the Supreme Court noted in Harman v. Forssenius, 1965, 380 U.S. 528, 543, 85 S.Ct. 1177, 1186, 14 L.Ed.2d 50, "the forty-six states which do not require the payment of poll taxes have apparently found no great administrative burden in insuring that the electorate is limited to bona fide residents." The availability of other registration devices which do not impede the right to vote undermines this basis for justifying the poll tax.

■ The State in its brief asserts that "it appears ridiculous to state that anyone who is interested in the welfare and the conduct of the government * * * would or could not save the sum of $1.75 during the course of a year" and that "any person, white or colored, who was incapable of managing his affairs and acquiring during the course of one year the insignificant sum of $1.75 certainly is not intelligent enough or competent enough to manage the affairs of the government." Regardless of whether the ability to accumulate a sum of money is a valid criterion for determining qualification to vote,[73] the actual administration of the poll tax laws clearly indicates that no such standard has ever been applied in Texas. The ignorant and incompetent spouse, parent or child may vote if some member of his family remembers to purchase a poll tax for him.[74] Anyone who becomes 21 years old after the beginning of the tax year but before the election [75] or who is over 60 years old [76] may vote without paying a poll tax fee [77] or without showing the intelligence or competence necessary to accumulate $1.75 in one year. Thus, it is obvious that the poll tax in Texas is not a "test" of the intelligence or the competence of potential voters.

■ The final basis of justification, and the only one seriously relied on by the State, is that the tying of the poll tax to the right to vote is a legitimate method of collecting the head tax which is imposed upon all Texans between the ages of 21 and 60. Over the years there have existed several means for enforcing the poll tax. An 1891 law, which was repealed in 1965, provided that delinquent

72. Vernon's Annotated Texas Statutes report numerous appellate actions of fraudulent vote buying involving the poll tax: e. g., Duncan v. Willis, 1957, 157 Tex. 316, 302 S.W.2d 627; Longoria v. State, 1934, 126 Tex.Cr.R. 362, 71 S.W.2d 268; Johnson v. State, 1915, 77 Tex.Cr.R. 25, 177 S.W. 490; Beach v. State, 1914, 75 Tex.Cr.R. 434, 171 S.W. 715; Solon v. State, 1908, 54 Tex.Cr.R. 261, 114 S.W. 349; Fugate v. Johnston, Tex.Civ. App.1952, 251 S.W.2d 792.

73. The proposition suggests the period in history when only the landed gentry were considered fit to participate in the affairs of government.
 In the same vein the Senate Committee Report stated that
 the poll tax, in essence, puts a price on the ballot, and if you can pay this price you are "qualifed" to vote—if you cannot pay this sum you are somehow not a qualified citizen. This remnant from the days of property "qualifications" for voting purposes cannot stand. For the payment of a poll tax tells us nothing about a citizen's qualifications as an elector. This requirement, then, so heavily involved with various procedural devices for payment does only one thing —it is an effective barrier to voting.
 S.Rep. No. 162, 89th Cong., 1st Sess., pt. 3, at 34 (1965).

74. Tex. Election Code arts. 5.11–5.12 (Supp.1965).

75. Tex. Election Code art. 5.17 (Supp. 1965).

76. Tex. Election Code art. 5.09 (Supp. 1965).

77. In 1960, 125,000 Texans turned 21 and 1,076,666 were 60 or over. U.S. Bureau of Census, U.S. Census of Population, 1960, Final Report, PC (1)–45B (Texas) Table 16.

poll tax payers would be liable to work three days per year on the roads.[78] The State Comptroller, among whose tasks is the supervision of poll tax collections, does not recall the use of this provision during his twenty-one years in the Comptroller's office.

Prior to 1947, poll taxes were assessed along with ad valorem taxes. Failure to pay the poll tax would result in the classification of the taxpayer as delinquent and make him liable to possible levy on his real or personal property. Assessment slips for ad valorem and poll taxes were mailed together to the taxpayer and could be paid at the same time. This convenient method of assessment was discontinued at the request of the State Comptroller and with the approval of the Attorney General. No reasons have been offered by the State to explain this action.[79] Since that time, assessment slips generally have not been mailed to taxpayers and poll taxes have been assessed only at the time of voluntary payment.[80] With the exception of setting up substations in some metropolitan areas for the collection of poll taxes, neither the State nor most of its Tax Assessors [81] make any other effort to increase the number of poll tax payers or to enforce its payment by non-voters.

Since the State has *voluntarily* abandoned the use of the most logical means for collecting the poll tax, *i. e.*, by assessing it along with the ad valorem taxes, and has made no attempt to enforce the tax except by use of the penalty of disenfranchisement, it is difficult to accept the State's contention that the tying of the poll tax to the right to vote is necessary for the collection of the tax.[82]

Even if we assume the validity of this position, we still would not find the poll tax as a prerequisite to voting to be justified as an encroachment on a fundamental right "necessary * * * to the accomplishment of a permissible State policy." The permissible state policy here is not the perpetuation of a head tax, as such, but the raising of revenue. When viewed in this perspective, it is clear that the poll tax as a restriction on the right to vote is not "necessary" to insure the collection of revenue. The mere fact that 46 other states have been able to raise funds without such a requirement demonstrates this obvious conclusion. That poll tax receipts constitute only a minute percentage of the revenue of the State of Texas [83] does not prove that the poll tax is not a revenue measure, as the United States asserts, but it does indicate that the State of Texas has also been able to find adequate means of collecting revenue which do not restrict the right to vote.[84]

78. Tex.Laws 1891, ch. 97, § 23, 10 Gammel, Laws of Texas 153 (1898), Tex.Rev. Civ.Stat. art. 6758 (Supp.1965).

79. Three years prior to this change in method of assessment, the United States Supreme Court held that Negroes could not be excluded from primary elections. Smith v. Allwright, 1944, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987.

80. The Texas Legislative Council Report suggests the reinstatement of the pre-1947 assessment methods to increase payment of the poll tax. Texas Legislative Council 113.

81. It is true, however, that in many counties the Tax Assessors give numerous interviews to the news media to publicize and to encourage the sale of poll taxes. In addition, various private and civic organizations have been active in the promotion of poll tax sales.

82. Evidence has been offered to show that the rate of payment of the poll tax percentage-wise has decreased since its collection was tied to the exercise of the franchise. See note 57, supra.

83. The poll tax revenue constitutes .19% of the estimated 1965 general revenue fund and .76% of the available school fund. See Calvert, 1965–1967 Biennial Revenue Estimate 2, 10.

84. It is interesting to note that the poll tax is administratively the most expensive of all the taxes levied by the State of Texas. It costs 19.4 cents per dollar to collect the poll tax, while it costs 7.1 cents for the next most costly tax (the Motor Vehicle Sales Tax), 2.4 cents for the average tax, and only .1 cents for the largest revenue tax (the Oil and Natural Gas Tax). Deposition of Robert Calvert, State Comptroller, Table III–5.

The poll tax in Texas is indeed a very strange revenue tax, when compared with other admittedly legitimate taxes. It was tied to the franchise for a discriminatory reason. For unknown reasons, the State has abandoned the most reasonable means for its collection. Although the Texas Constitution requires all persons between 21 and 60 to pay the tax, only those who wish to vote ordinarily "volunteer" to pay it, and the State makes no other attempt to enforce it. Inasmuch as no acceptable basis for justifying the poll tax as a prerequisite for voting has been offered, the due process clause requires that this unnecessary restriction on the fundamental right to vote be eliminated.

## IX.

■ Since, in general, only those who wish to vote pay the poll tax, the tax as administered by the State is equivalent to a charge or penalty imposed on the exercise of a fundamental right. If the tax were increased to a high degree, as it could be if valid, it would result in the destruction of the right to vote. See Grosjean v. American Press Co., 1936, 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660.

It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. Frost & Frost Trucking Co. v. Railroad Comm'n of California, 271 U.S. 583, [46 S.Ct. 605, 70 L.Ed. 110]. "Constitutional rights would be of little value if they could be * * * indirectly denied," Smith v. Allwright, 321 U.S. 649, 664 [64 S.Ct. 757, 765, 88 L.Ed. 987], or "manipulated out of existence," Gomillion v. Lightfoot, 364 U.S. 339, 345 [81 S.Ct. 125, 129, 5 L.Ed.2d 110].

Harman v. Forssenius, 1965, 380 U.S. 528, 540, 85 S.Ct. 1177, 1185.

The State asserts that "the Legislature, and people of Texas, have had the choice, insofar as the poll tax was concerned, of selecting the method of collection. The Legislature and the people choose to deny the right to vote to those who do not pay rather than some more onerous method of collection." It is clear, however, that the Legislature and the people may not choose to deny a fundamental constitutional right as a means of collecting revenue. " 'One's right to life, liberty, and property * * * and other fundamental rights may not be admitted to vote; they depend on the outcome of no election.' A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." Lucas v. Forty-Fourth General Assembly, 1964, 377 U.S. 713, 736–737, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632. If the State of Texas placed a tax on the right to speak at the rate of one dollar and seventy-five cents per year, no court would hesitate to strike it down as a blatant infringement of the freedom of speech. Yet the poll tax as enforced in Texas is a tax on the equally important right to vote.

The Supreme Court has dealt with attempts to license or tax fundamental constitutional rights. In Grosjean v. American Press Co., 1936, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660, a tax on gross receipts of newspapers with circulation in excess of 20,000 copies per week was found to be an abridgement of the freedom of the press as "a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." Id., at 250, 56 S.Ct. at 449.

An ordinance requiring a permit to distribute handbills was held invalid on its face in Lovell v. City of Griffin, 1937, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949, as a restraint on the freedom of the press. In Murdock v. Com. of Pennsylvania, 1945, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, an ordinance requiring religious colporteurs to pay a license tax as a precondition to the pursuit of their activities was stricken down as a denial of first amendment rights. In answer to the contention that "the fact that the license tax can suppress or control this ac-

tivity is unimportant if it does not do so," the Court in *Murdock* stated:

> But that is to disregard the nature of this tax. It is a license tax—a flat tax imposed on the exercise of a right granted by the Bill of Rights. *A state may not impose a charge for the enjoyment of a right granted by the federal constitution.*

*Id.,* at 112–113, 63 S.Ct. at 875. (Emphasis added.)

Since the poll tax in Texas is enforced only against those who wish to vote, it is, in effect, a penalty imposed on those who wish to exercise their right to vote. Even if the poll tax were seriously enforced as a revenue measure, the tying of its collection to the franchise would be invalid as a charge on a very precious constitutional right.

### X.

The State of Texas contends that the 1937 Supreme Court case, Breedlove v. Suttles, 1937, 302 U.S. 277, 58 S.Ct. 205, 82 L.Ed. 252, controls the questions raised in this suit. The only issues, however, discussed by the Court in that case were whether the Georgia poll tax violated the equal protection clause, since it applied only to persons between the ages of 21 and 60 and to women who registered to vote; whether payment of the poll tax as a prerequisite of voting denied any privilege or immunity protected by the Fourteenth Amendment; and whether the poll tax requirements abridged the provisions of the Nineteenth Amendment. Although dicta may be found in the opinion supporting the validity of the poll tax as a prerequisite to voting, we do not believe that the holding in *Breedlove* applies to the issues raised here or that the dicta, in the light of more recent Supreme Court pronouncements concerning the right to vote (see *e. g.,* Wesberry v. Sanders, supra; Reynolds v. Sims, supra), should guide our decision.

For the reasons stated herein, we hold that the poll tax as a prerequisite to voting in the State of Texas infringes on the concept of liberty as protected by the Due Process Clause and constitutes an invalid charge on the exercise of one of our most precious rights—the right to vote. In view of the impending elections, appropriate declaratory and injunctive relief is being ordered by appropriate decree.

### DECREE

This cause having come on for trial at which all parties were present by counsel; and the Court having heard the evidence and having considered the pleadings, evidence and argument of counsel and being of the view that a Decree should be entered in accordance with the opinion of the Court prepared for the Court by Judge Thornberry, which also constitutes the Court's findings of fact and conclusions of law under F.R.Civ.P. 52(a), filed this date, it is therefore ordered, adjudged and decreed:

First. That Article VIII, Section 1, and Article VI, Sections 2 and 3 of the Texas Constitution, Article 2.01 of the Texas General Taxation Code, Article 13.21 of the Texas Election Code and all other Texas statutes implementing the poll tax are hereby declared unconstitutional and invalid insofar as they require the payment of a poll tax as a prerequisite to voting in general, special and primary elections, Federal, state or local, in the State of Texas.

Second. The defendants herein, their respective agents, servants, employees and successors, and all other persons having knowledge thereof who have any responsibility under election procedure laws of the State of Texas or its political subdivisions, are hereby enjoined and prohibited from requiring the payment of a poll tax as a prerequisite to voting in general, special and primary elections, Federal, State or local, in the State of Texas, and from applying or enforcing the provisions of the Texas Constitution and statutes referred to in paragraph FIRST hereof insofar as they require the payment of a poll tax as a prerequisite to voting in general, special and primary elections, Federal, state or local, in the State of Texas.

Third. This decree shall be effective immediately, but paragraph second hereof is stayed for the period of 14 days to enable the parties to submit an application for stay to the Circuit Justice, the Supreme Court, or a Justice thereof.

Fourth. The Court retains jurisdiction of this cause for such other and further orders as may be required.